```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3   UNITED STATES OF AMERICA    )   CASE NO. 1:13CR54-1
                                 )
 4          vs.                  )
                                 )   Winston-Salem, North Carolina
 5   JODY DELANO HAIRSTON        )   November 18, 2020
     _____   1:37 p.m.
 6

 7

 8      TRANSCRIPT OF THE **SUPERVISED RELEASE REVOCATION HEARING**
           BEFORE THE HONORABLE THOMAS D. SCHROEDER
 9                UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12   For the Government:     RANDALL GALYON, AUSA
                             Office of the U.S. Attorney
13                           251 N. Main Street, Suite 726
                             Winston-Salem, North Carolina 27101
14

15   For the Defendant:     GEORGE E. CRUMP, III, ESQ.
                            P.O. Box 1523
16                          Rockingham, North Carolina 28379

17

18   Court Reporter:        BRIANA L. BELL, RPR
                            Official Court Reporter
19                          P.O. Box 20991
                            Winston-Salem, North Carolina 27120
20

21

22

23

24
          Proceedings recorded by mechanical stenotype reporter.
25       Transcript produced by computer-aided transcription.
```

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

```
1                              INDEX

2

3    GOVERNMENT'S WITNESSES:                          PAGE:

4    OFFICER JAMES K. MEEKS

5        Direct Examination by Mr. Galyon             8
         Cross-Examination by Mr. Crump               25
6

7    OFFICER JAMES PRUITT

8        Direct Examination by Mr. Galyon             27
         Cross-Examination by Mr. Crump               48
9

10

11   DEFENDANT'S WITNESSES:                           PAGE:

12   JODY DELANO HAIRSTON

13       Direct Examination by Mr. Crump              50
         Cross-Examination by Mr. Galyon              51
14

15                           EXHIBITS

16   Exhibits:                       Identified   Received
     G-1      DVD of Officer Meeks' body    19        20
17            camera footage
     G-2      Plastic bag containing drugs  38        40
18   G-2A     DEA lab report                38        40
     G-3      DVD of Officer Pruitt's body  40        41
19            camera footage

20

21

22

23

24

25
```

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

P R O C E E D I N G S

1

2        (The Defendant was present.)

3             **THE COURT:**  Mr. Galyon.

4             **MR. GALYON:**  Good afternoon, Your Honor.

5             **THE COURT:**  Good afternoon.

6             **MR. GALYON:**  The next matter is going to be United

7     States of America versus Jody Delano Hairston.  It's

8     1:13CR54-1, represented by George Crump.  The matter is on

9     related to a supervised release violation hearing.

10            Your Honor, just to alert the Court, the Government

11    is not going to proceed on Violation No. 1 related to a driving

12    while impaired.  I believe that there may be some admissions as

13    to some of the other conduct or violations.  I do anticipate

14    offering testimony from two different officers related to two

15    of the violations.

16            **THE COURT:**  Mr. Mauney is here, it looks like, on

17    behalf of Probation.

18            Mr. Crump, good afternoon, sir.

19            **MR. CRUMP:**  Good afternoon.

20            **THE COURT:**  Let me first start with the

21    preliminaries.

22            Did you receive a copy of the petition as amended and

23    the supplement?

24            **MR. CRUMP:**  Yes, Your Honor.

25            **THE COURT:**  Have you reviewed those with your client?

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1          **MR. CRUMP:**  Yes, Your Honor.

2          **THE COURT:**  Are you prepared for a hearing today as

3  to whether his supervision should be revoked?

4          **MR. CRUMP:**  Your Honor, we're prepared to go forward.

5          **THE COURT:**  Okay.  All right.  Mr. Hairston, I need

6  to speak with you briefly, if you would stand for a moment.

7          Good afternoon.

8          **THE DEFENDANT:**  Yes, sir.  Good afternoon.

9          **THE COURT:**  Did you receive a copy of the materials I

10  mentioned?

11          **THE DEFENDANT:**  Yes, sir, I think I left them in the

12  thing out there when they scanned me through, but he did give

13  me a copy.

14          **THE COURT:**  That's okay.  I am just interested in

15  knowing whether you've seen and read them?

16          **THE DEFENDANT:**  Yes, sir.

17          **THE COURT:**  Did you review them with your lawyer?

18          **THE DEFENDANT:**  Yes, sir.

19          **THE COURT:**  Do you understand the charges that are

20  pending against you?

21          **THE DEFENDANT:**  Yes, sir.

22          **THE COURT:**  Thank you.

23          So the Government is not proceeding on Violation 1;

24  correct?

25          **MR. GALYON:**  That's correct, Your Honor.

US v. Jody Hairston  —— SRV hearing  —— 11/18/20

1      **THE COURT:**  So the Government is proceeding on

2  Violations 2 through 5.

3          Violation 2 alleges that on March 13, 2020,

4  Mr. Hairston was arrested by the Eden Police Department in

5  Eden, North Carolina, charged with possession of heroin and

6  resisting a public officer, the conduct set forth in there.

7  The allegation is that he had a baggy that contained

8  approximately 4 grams of heroin.

9          Violation 3 alleges that he was arrested on March 28,

10  2020, by the North Carolina State Highway Patrol, and he failed

11  to notify of his probation officer of the contact with law

12  enforcement within 72 hours.

13          Violation 4, he tested positive for marijuana

14  September 16, 2019, and tested positive for marijuana on

15  November 22, 2019, and admitted to that use on the latter one.

16          Violation 5 alleges that on September 2, 2020, he was

17  arrested by the Eden Police Department, charged with

18  trafficking in methamphetamine, possession of heroin, and

19  maintaining a vehicle, dwelling, or place for keeping and

20  selling controlled substances.  The petition alleges that the

21  officers located a peach Crown Royal bag by the driver's door

22  of Mr. Hairston's vehicle that contained 154 grams of crystal

23  meth, 11 grams of heroin.

24          So does your client admit or deny these?

25          **MR. CRUMP:**  Your Honor, we filed a position paper.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  He's changing his plea.  He does admit that he violated Nos. 3

2  and 4, failing to identify to the probation officer and the

3  marijuana use.

4          **THE COURT:**  All right.

5          **MR. CRUMP:**  He denies No. 2 completely.  That's the

6  incident in March, 2020, with the Eden Police Department.  And

7  he denies Violation 5 completely, and that involves also the

8  Eden Police Department back on September 2.

9          **THE COURT:**  Okay.  Do you know what the status of the

10 state court proceedings are as to both of those?

11         **MR. GALYON:**  Your Honor, I don't think they've been

12 resolved in the state.  I believe that the last I saw is that

13 they were continued out for periods of time.  I think -- I

14 don't know what the most recent court date is, but to my

15 knowledge, they haven't been resolved in the state.

16         **THE PROBATION OFFICER:**  Your Honor, the trafficking

17 in methamphetamine charge, I believe the last court date I saw

18 was November 30 of 2020, and the driving while impaired in

19 Johnston County is January 12, 2021, and the possession of

20 heroin is still pending, I guess waiting for a trial date to be

21 set.

22         **THE COURT:**  All right.  So for the two we're worried

23 about, they still have a date yet to come?

24         **MR. GALYON:**  Correct.

25         **THE COURT:**  Okay.  Thank you.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1          MR. GALYON:  Your Honor, I want to make the Court

2    aware, because I received information just a few minutes ago

3    from Probation related to some additional conduct related to a

4    speeding ticket that Mr. Hairston received last night, that he

5    also failed to make an appointment yesterday because he

6    indicated he didn't have transportation but then was driving a

7    vehicle after that period of time and received a speeding

8    ticket, and then today he's tested positive for marijuana,

9    cocaine, and amphetamines before the hearing.

10         THE COURT:  All right.  What are you proposing?  That

11   I consider those as well today?

12         MR. GALYON:  I want to make sure the Court is aware

13   of those.

14         THE COURT:  Did you have notice of that, Mr. Crump?

15         MR. CRUMP:  Your Honor, we contend we don't have

16   sufficient notice, and we contend that those may be issues on

17   sentencing, that he's admitted Violations 3 and 4, but we would

18   contend it's unnecessary to proceed on new violations, you

19   know, with the Government going forward today on No. 4 that

20   we've had had adequate notice on.

21         THE COURT:  All right.  Well, if you're objecting as

22   to notice grounds, are you saying it can't be the basis for any

23   consideration by the Court?  I thought I heard you to say

24   that --

25         MR. CRUMP:  I think it's fair as far as a sentencing

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  disposition, but in terms of an actual violation, I don't feel

2  like we have sufficient notice, you know, to be notified within

3  an hour of those last two violations.

4            **THE COURT:**  Well, I'll proceed on that basis then.

5  Let me see what the evidence is, and then we'll address it at

6  that point; but there won't be any evidence as to either of

7  those violations today.

8            **MR. GALYON:**  Understood.

9            **THE COURT:**  All right.  If you will call your

10  witnesses.

11            **MR. GALYON:**  The United States will first call Kevin

12  Meeks.

13            **THE COURT:**  How many witnesses do you have?

14            **MR. GALYON:**  Your Honor, just two.  They are both

15  from the Eden Police Department.

16            **THE COURT:**  That's fine.  I'm just trying to get a

17  sense.

18            **MR. GALYON:**  Yes, sir.

19  **OFFICER JAMES K. MEEKS,** GOVERNMENT'S WITNESS, being first duly

20  affirmed, at 1:44 p.m. testified as follows:

21                        DIRECT EXAMINATION

22  **BY MR. GALYON**

23  Q    If you would, state your name for the record.

24  A    My name is James Kevin Meeks.

25            **THE COURT:**  You may remove your mask, Officer.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  **BY MR. GALYON**

2  Q    And how are you employed, sir?

3  A    I'm a police officer with the City of Eden.

4  Q    How long have you been employed with the City of Eden?

5  A    Two and a half years.

6  Q    And during the time that you've been with Eden, what's

7  been your duty assignment?

8  A    Patrol.

9  Q    Did you have contact with Jody Hairston on March 13 and

10  September 2 of this year?

11  A    Yes, sir, I did.

12  Q    Prior to your contact with Mr. Hairston on March 13 of

13  this year, were you aware that he was on federal supervised

14  release?

15  A    No, sir.

16  Q    After that incident in March, were you aware that he was

17  on federal supervised release?

18  A    Yes, sir.

19  Q    Do you know that he had been convicted of a drug crime in

20  federal court?

21  A    Yes, sir.

22  Q    And also a firearms crime?

23  A    Yes, sir.

24  Q    And prior to your interaction with Mr. Hairston on March

25  of this year, had you dealt with him previously?

1  A     No, sir.

2  Q     I want to turn your attention to March 13 of this year.

3  You were working that day; is that right?

4  A     Yes, sir.

5  Q     Were you in uniform?

6  A     Yes, sir.

7  Q     And do you work in a marked or an unmarked vehicle?

8  A     Marked.

9  Q     At that time did you have a body-worn camera?

10 A     No, sir.

11 Q     Why not?

12 A     December 25th I was involved in a domestic situation while

13 I was working, and my body cam was damaged.

14 Q     So you didn't have a body camera on the March 13 date?

15 A     No, sir.

16 Q     If you would, explain what happened related to the

17 March 13 and how you came into contact with this Defendant.

18 A     Yes, sir.  On March 13, I ended up clearing a call that's

19 behind a convenience store.  It's a trailer park back that

20 there.  I just cleared it dealing with a brown dog.  I had my

21 windows down.  It was a nice sunny day in the spring.  I ended

22 up noticing a gold-in-color Kia Optima.  It passed me.  It was

23 going on Friendly Road.  I ended up noticing the odor of

24 marijuana.  So I attempted to get behind the vehicle where the

25 vehicle pulled into the gas station.  So I decided to go ahead

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1 and go up through Grand Oaks Drive, and I turn around and I

2 wait.  I noticed Jody Hairston go inside the store.

3 Q     Was he the driver of the vehicle?

4 A     Yes, sir, he was.

5 Q     Was there anybody else in the vehicle?

6 A     No, sir.  And he was approximately in the store for maybe

7 15 seconds.  He comes back out, and he puts the gas pump into

8 his car.  I decided to do a consensual encounter.  I pull up,

9 and I make contact with Jody.  I make up the story about the

10 dog, just in an attempt to get closer to confirm the odor of

11 marijuana.

12       Once I got close enough to Jody, I noticed that the gas

13 pump -- I noticed that the gas pump had not been turned on.

14 These are old gas pumps.  You can't put a debt card in there.

15 They are prepay.  So he didn't have it on.

16       Once I got close enough talking to him about the dog, I

17 noticed the odor of marijuana.  I advised Jody, "Hey, I am

18 going to detain you for the odor of marijuana."  When I reached

19 out for him, he took off running.  I ended up chasing him.

20 Once I got close enough, he had turned around, and in his right

21 hand, he dropped a plastic baggy.  At that time I didn't know

22 what it was.  He darts across the store, and I end up fighting

23 him in a ditch where he tripped over a kerosene pump.

24       I ended up finally being able to detain him due to the

25 help of a citizen.  One of my handcuffs was locked, so I

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  couldn't get the other hand in there, and he kept reaching in

2  his waistband.  Once we finally got him detained, got him in

3  the car, retrieved that plastic baggy.  It had been ran over,

4  but it still had enough substance in it to be tested, and it

5  tested positive for heroin.

6          **MR. CRUMP:**  Object to the evidence as to what the bag

7  contained.

8          **THE COURT:**  Well, overruled.  He can testify as to

9  what it was reported to him to contain.

10 **BY MR. GALYON**

11 Q    And after you were able to get Mr. Hairston in custody,

12 did you go back and conduct a search of the vehicle?

13 A    Yes, sir.

14 Q    Was there an open container in the vehicle?

15 A    Yes, sir, there was.

16 Q    So there was open alcohol in the vehicle; is that right?

17 A    Correct.

18 Q    And then, subsequently, was the substance that was seized

19 in the plastic baggy -- was that sent to the SBI for testing?

20 A    Yes, sir.

21 Q    To your knowledge, you haven't received back the results;

22 is that right?

23 A    No, sir, I have not.

24 Q    Other than the field test that you did?

25 A    Correct.

1          **THE COURT:**  What?

2          **MR. GALYON:**  Other than the field test.

3          **THE COURT:**  What field test?

4          **MR. GALYON:**  He indicated that they had conducted a

5    field test that was positive for heroin.  That's what Mr. Crump

6    had been objecting to.

7          **THE COURT:**  I didn't hear that testimony.  Maybe I

8    missed it.

9          **THE WITNESS:**  Yes, sir, I advised that we did a field

10   test kit where we had put part of that substance into it and

11   popped it, and it tested positive for heroin.

12         **THE COURT:**  Okay.  Thank you.

13   **BY MR. GALYON**

14   Q    So September 2 of this year, did you also have contact

15   with Jody Delano Hairston on that day?

16   A    Yes, sir.

17   Q    And how did that happen?

18   A    We received a call of a suspicious vehicle that first came

19   out as a white Chrysler parked in the back of the Baymont Inn.

20   I ended up making a phone call to the clerk, and I asked, "Hey,

21   were you the one that called?"  She said, "Yes."  I said, "The

22   reason why I'm calling, the notes are advising that the female

23   just went into the room."  She said, "No, she's back in the

24   car, and a gray Nissan has pulled up and backed up beside her,

25   and there are sitting there with their lights running."

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 13 of 80

1    So I advised Sergeant Pruitt of my findings.  We ended up

2  pulling around, our lights were off, and we did not lock the

3  vehicles in, and made a consensual encounter.  I ended up

4  seeing Jody in the vehicle, noticed that he was reaching, and I

5  advised Sergeant Pruitt of same, and then I made contact with

6  the passenger, Christie Smith.

7  Q    Just so we're clear, the two vehicles that were related to

8  you in the call as suspicious vehicles were a white vehicle, a

9  white Chrysler?

10 A    Yes, sir.

11 Q    And a Nissan Ultima; is that correct?

12 A    Correct.

13 Q    And so they're backed up into spaces in the parking lot at

14 the Baymont Inn?

15 A    Yes, sir.

16 Q    To your knowledge, did they have rooms at that hotel?

17 A    Not at that time, no.

18 Q    And you then made contact with the white vehicle, the

19 white Chrysler; is that right?

20 A    Yes, sir.

21 Q    And who was in that vehicle?

22 A    That was Christie Smith and a Kanesha Hart, I believe.

23 Q    And during your encounter with them, did you talk to them

24 about why you were there?

25 A    Yes.  Christie advised me that she was there to get a

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 14 of 80

1  room.

2  Q    But did not have one at that time?

3  A    Correct.

4  Q    And while you were talking to Ms. Smith and Ms. Hart, did

5  you notice anything in this vehicle?

6  A    Yes, sir, there was an unsealed half empty bottle of

7  Patron.

8  Q    And that's alcohol?

9  A    Correct.

10 Q    And so what did you do?

11 A    I asked her to hand it to me.

12 Q    And once you received the half empty bottle of alcohol,

13 what did you do with it?

14 A    I stuck it on top of the car.

15 Q    And did you continue to talk to Ms. Smith and Ms. Hart?

16 A    Yes, sir.

17 Q    Did you get identification from them at any point?

18 A    Yes, sir, I obtained the driver's license from both.

19 Q    And during the course of your interactions with them, did

20 you subsequently get information that Ms. Smith had active

21 warrants for her arrest?

22 A    Yes, sir, I did.

23 Q    And she was then placed under arrest; is that right?

24 A    Yes, sir.

25 Q    In the interim did you walk over to the other vehicle

1  where Mr. Hairston was?

2  A    Yes, sir, I did.

3  Q    Now, Sergeant Pruitt was the one that had first contact

4  with Mr. Hairston; is that right?

5  A    Yes, sir.

6  Q    And then during the course of that interaction, you walked

7  over; is that right?

8  A    Yes, sir.

9  Q    Were you wearing body-worn camera that day?

10 A    Yes, sir, I was.

11 Q    So was this the one that got fixed, or was it new?

12 A    It is a new one.

13 Q    So in September, you had body-worn camera on in addition

14 to your uniform; is that right?

15 A    Yes, sir.

16 Q    Was it activated?

17 A    Yes, sir.

18 Q    So during your interaction with Ms. Smith and Ms. Hart and

19 then later with Ms. Hairston, that was all on video?

20 A    Yes, sir.

21 Q    And have you had a chance to review the video?

22 A    Yes, sir.

23 Q    So during the course of you walking over toward

24 Mr. Hairston's vehicle, did Sergeant Pruitt ask Mr. Hairston to

25 get out of the vehicle?

1   A    Yes, sir, he did.

2   Q    And when Mr. Hairston got out of the vehicle, what do you

3   see on the video?

4   A    In the video, you see an orange bag in his right hand, and

5   he drops it.

6   Q    And after the fact, did you have a chance to see what was

7   in that orange bag?

8   A    Yes, sir, I did.

9   Q    What was it?

10  A    It was methamphetamine and a bag of a yellow substance,

11  which appeared to be heroin.

12  Q    When you went over to the vehicle Mr. Hairston was in, did

13  you assist Officer Pruitt -- or Sergeant Pruitt in detaining

14  Mr. Hairston?

15  A    Yes, sir, I did.

16  Q    And then did you also look in adjacent vehicles to see

17  what had been dropped?

18  A    Yes, sir.

19  Q    At that time, you didn't realize where the orange bag

20  went; is that right?

21  A    Correct.

22  Q    And then subsequently, you were involved in processing

23  Ms. Smith and taking her to jail; is that right?

24  A    Yes, sir.

25  Q    Sergeant Pruitt was responsible for Mr. Hairston; is that

1  right?

2  A     That is correct.

3  Q     Okay.  Talking about the Baymont Inn -- I just want to be

4  clear about this part -- what time of day or night was it that

5  you all went over there on a suspicious vehicle call?

6  A     According to my report, it was 10:44 p.m.

7  Q     And that Baymont Inn is on Linden street in Eden; is that

8  right?

9  A     Linden Drive.

10 Q     And have you been out there before related to calls for

11 service?

12 A     Yes, sir.

13 Q     How often do you all have to go out there?

14 A     One to two times a month.

15        **MR. CRUMP:**  Your Honor, I'm going to object to other

16 instances of activity at Baymont Inn.

17        **THE COURT:**  Overruled.

18 **BY MR. GALYON**

19 Q     And when you have gone out there, the majority of the

20 calls, do they end up relating to drugs?

21 A     Yes, sir.

22 Q     Okay.  You mentioned that that was one to two times a

23 month.  And that's just your shift; right?

24 A     Correct.

25 Q     You've had an opportunity to review the video from your

1  body-worn camera; is that correct?

2  A    Yes, sir.

3           MR. GALYON:  And it's been provided to the defense.

4           Your Honor, if I may approach the witness?

5           THE COURT:  Yes.

6  BY MR. GALYON

7  Q    I'm going to show you what's been marked as Government's

8  Exhibit 1 for identification.  I will ask if you recognize

9  that?

10 A    Yes, sir.

11 Q    What's that?

12 A    This part?

13 Q    Just the whole object.

14 A    It's says "Hairston," and it's got my initials on it from

15 my body cam footage.

16 Q    So this is a DVD; is that right?

17 A    Yes.

18 Q    And you've had an opportunity to review this DVD.  It

19 contains footage from your body-worn camera from September 2 of

20 2020 --

21 A    Yes, sir.

22 Q    -- is that right?

23 A    Yes, sir.

24 Q    And the bottom here lists the MP4 file name associated

25 with that particular file; is that right?

1  A    Yes, sir.

2  Q    Okay.

3           **MR. GALYON:**  Your Honor, I'm going to ask that what's

4  been marked as Government's Exhibit 1 be admitted.

5           **THE COURT:**  It's admitted.

6           **MR. GALYON:**  Your Honor, I've got the video set up

7  here.  If we can play -- and I tested it.  I believe that the

8  sound is not going to be too loud.

9           Can the Court see?  Is it coming up on your monitor

10 as well, Your Honor?

11          **THE COURT:**  Yes.

12          **MR. GALYON:**  Okay.

13 **BY MR. GALYON**

14 Q    So, Officer Meeks, this is the start of your body-worn

15 camera, is that right --

16 A    Yes, sir.

17 Q    -- from that night?

18 A    Yes, sir.

19 Q    And when you all -- you and Sergeant Pruitt arrived, did

20 you have your emergency equipment -- the lights on your

21 vehicle, were they flashing?

22 A    No, sir.

23 Q    Did you come in with a siren?

24 A    No, sir.

25 Q    And you mentioned that you did not block in the vehicles;

                US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  is that right?

2  A    Correct.

3  Q    Okay.  Because you didn't have the emergency equipment

4  activated, did you have to manually start your video?

5  A    So the way our body cams work, I have to manually turn it

6  on.

7  Q    All right.

8       (Government's Exhibit 1 played.)

9       And now you just said, "That's Jody Hairston"; is that

10 right?

11 A    Yes, sir.

12 Q    And as we're here at 24 seconds into the video, if you

13 could, just explain what it is that we're seeing.  There is a

14 white vehicle to the left.  Who is in that car?

15 A    In the vehicle to the left, that's going to be Christie

16 Smith and Kanesha Hart, and then in vehicle on the right,

17 that's going to be Jody Hairston.

18 Q    And he's the only person in that vehicle on the right, the

19 gray Nissan Ultima?

20 A    Correct.

21 Q    When you say "That's Jody," who are you talking to?

22 A    Sergeant Pruitt.

23 Q    He's on scene at that point?

24 A    Yes, sir.

25 Q    And where is he parked, if you know?

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  A    He's parked adjacent from me.

2       (Government's Exhibit 1 played.)

3  Q    Now, the person in the passenger seat is Ms. Smith; is

4  that right?

5  A    Yes, sir.

6  Q    And later on, after you arrest her on the outstanding

7  warrants, did you also seize suspected methamphetamine from

8  her?

9  A    Yes, sir, I did.

10 Q    Okay.  And that was in that vehicle as well?

11 A    Correct.

12      (Government's Exhibit 1 played.)

13 Q    When you say "Janae (phonetic) called," that's the

14 employee with the Baymont Inn that had called law enforcement;

15 is that right?

16 A    Yes, sir.

17 Q    I'm going to go ahead and move -- you have continued

18 conversation with these two for a couple of minutes, and then

19 you move over toward Mr. Hairston's vehicle; is that right?

20 A    Yes, sir.

21 Q    So I'm going to move the video forward closer to about

22 three minutes in -- or a little over three minutes in.

23      (Government's Exhibit 1 played.)

24      On top of the vehicle there is the Patron bottle that you

25 received; is that right?

1   A     Yes, sir.

2   Q     I'm going to stop it here.  We're at 3 minutes and 55

3   seconds into the video.

4         On the left-hand side of the video, who is that?

5   A     That's Sergeant Pruitt.

6   Q     Okay.  And he's outside of the driver's side of the Nissan

7   Ultima; is that right?

8   A     Yes, sir.

9   Q     Okay.  And then over the next couple of seconds

10  Mr. Hairston gets out of the vehicle; is that right?

11  A     Yes, sir.

12        (Government's Exhibit 1 played.)

13  Q     Now, here at 3 minutes and 56 seconds, if you would, up on

14  that -- the big screen TV, if you could point to the object

15  that you were talking about, the orange bag.

16  A     (Indicating) It's going to be right here, sir.

17  Q     So on the screen, it's basically sort of on the far left

18  side of the screen; is that right?

19  A     Yes, sir.

20  Q     And then here at 3 minutes and 57 seconds, you see a hand

21  that's now empty; is that right?

22  A     Yes, sir.

23  Q     So the orange bag was dropped from Mr. Hairston's right

24  hand?

25              **MR. CRUMP:**  Objection to leading.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1              **THE COURT:**  Sustained.

2  **BY MR. GALYON**

3  Q    And here at 3 minutes and 59 seconds, can you see through

4  Mr. Hairston's vehicle -- do you actually see him through the

5  passenger window on the driver's side -- outside the driver's

6  side of the vehicle?

7  A    Yes, sir.

8  Q    Okay.  Again, there's no one else that was in that car; is

9  that right?

10 A    That is correct.

11 Q    Just Mr. Hairston?

12 A    Yes, sir, just him.

13      (Government's Exhibit 1 was played.)

14 Q    And during this time -- this is now 4 minutes and 4

15 seconds into the video -- Sergeant Pruitt is attempting to

16 detain Mr. Hairston; is that right?

17 A    Yes, sir.

18 Q    Okay.  Did you assist him?

19 A    Yes, sir.

20      (Government's Exhibit 1 played.)

21 Q    Now, here at 4 minutes and 17 seconds, what's happened?

22 A    My body cam has been knocked off.

23 Q    Okay.  So it falls down to the ground; is that right?

24 A    It falls into his car.

25 Q    Mr. Hairston's car?

   Case 1:13-cr-00054-TDS   Document 47   Filed 01/20/21   Page 24 of 80

1  A    Yes, sir.

2         (Government's Exhibit 1 played.)

3  Q    Were you all able to detain Mr. Hairston?

4  A    Yes, sir.

5  Q    You didn't have to take him to the ground?

6  A    No, sir.

7  Q    And then what happens to Mr. Hairston while he's being

8  detained?  Like, where he is taken?

9  A    He's being placed in the back of Sergeant Pruitt's patrol

10 vehicle.

11 Q    And then what do you and Sergeant Pruitt do?

12 A    Once he's placed in the back of the vehicle, we're

13 searching the area, looking for this orange bag.

14         **MR. GALYON:**  I don't have any further questions.

15         **THE COURT:**  Any cross, Mr. Crump?

16         **MR. CRUMP:**  Yes, Your Honor.

17                      CROSS-EXAMINATION

18 **BY MR. CRUMP**

19 Q    Officer Meeks, on March 13 of this year, how close were

20 you to Mr. Hairston's vehicle when you first detected the odor

21 of marijuana?

22 A    Approximately 10 feet.

23 Q    And was that odor clear and distinctive to you?

24 A    Yes, sir.

25 Q    Did you inform Mr. Hairston he was under arrest before he

            US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  left the vehicle?

2  A    At what part, sir?  At what part are you talking about?

3  Q    At some time Mr. Hairston left you and his vehicle; is

4  that correct?

5  A    Yes, sir.

6  Q    Okay.  Immediately prior to him leaving you and his

7  vehicle, did you tell Mr. Hairston that he was under arrest?

8  A    No, sir, I advised him he was detained.

9  Q    Okay.  Now, on March 2 -- strike that.

10      On September 2, 2020, this incident occurred at about

11  10:45 p.m.?

12  A    Yes, sir.

13  Q    The cars are backed into the back of the Baymont Inn

14  parking lot?

15  A    Yes, sir.

16  Q    From your investigation, the vehicle with the two women

17  were there first?

18  A    Yes, sir.

19  Q    And then Mr. Hairston was there?

20  A    Correct.

21  Q    Okay.  And you visually saw what appeared to be an orange

22  bag in Mr. Hairston's vehicle?

23  A    Not in his vehicle.  In his hand.

24  Q    In his hand?

25  A    Yes, sir.

1  Q    Was he still in his -- was his hand inside or outside of

2  his vehicle when you saw the orange bag?

3  A    It was still inside of the vehicle.

4  Q    It was still inside the vehicle?

5  A    Yes, sir.  He was exiting the vehicle.

6  Q    Okay.

7           **MR. CRUMP:**  Your Honor, that's all.

8           **THE COURT:**  Any redirect?

9           **MR. GALYON:**  No, Your Honor.

10          **THE COURT:**  Thank you.  You may step down, Officer.

11     (At 2:08 p.m., witness excused.)

12          **MR. GALYON:**  The United States calls Lee Pruitt.

13          **THE COURT:**  Do you want the witness stand wiped down?

14 I suppose that's Officer Pruitt's call.

15          **MR. GALYON:**  I'll be happy to do that.

16          **THE CLERK:**  I can get it.

17          **THE COURT:**  Ms. Engle graciously volunteered.

18          **THE COURT:**  You can step forward.  We're going to

19 clean the witness stand before you take the stand.

20     (Pause in the proceedings.)

21          **THE COURT:**  If you would remove your mask, if you

22 wouldn't mind, for purposes of testifying.

23 **OFFICER JAMES PRUITT,** GOVERNMENT'S WITNESS, being first duly

24 affirmed, at 2:09 p.m. testified as follows:,

25                    DIRECT EXAMINATION

1  **BY MR. GALYON**

2  Q    If you would, state your name for the record.

3  A    James Pruitt.

4  Q    And how are you employed, sir?

5  A    With the Eden Police Department.

6  Q    How long have you been with the Eden Police Department?

7  A    Fifteen and a half years.

8  Q    And what unit do you work on?

9  A    Patrol Unit.

10 Q    And have you worked patrol the whole time?

11 A    Yes, sir.

12 Q    Did you have contact with this Defendant, Jody Delano

13 Hairston, back on March 13 and September 2 of this year?

14 A    Yes, sir.

15 Q    Did you know at the time that you had contact with

16 Mr. Hairston in March and September that he was on federal

17 supervised release?

18 A    No, sir.

19 Q    Did you subsequently learn that information?

20 A    Yes, sir.

21 Q    Did you know in March of this year that Mr. Hairston was a

22 previously convicted felon?

23 A    Yes, sir.

24 Q    Had you been involved in any of the cases associated with

25 Mr. Hairston in the past?

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  A    Yes, sir.

2  Q    As part of that, had Mr. Hairston fled from you

3  previously --

4  A    Yes, sir.

5  Q    -- prior to March of this year?

6  A    Yes, sir.

7  Q    How tall are you?

8  A    6'4".

9  Q    Is Mr. Hairston taller or shorter than you?

10 A    Shorter.

11 Q    March 13 of this year, were you working that day?

12 A    Yes, sir.

13 Q    Were you in a marked patrol unit?

14 A    Yes, sir.

15 Q    In uniform or out of uniform?

16 A    In uniform.

17 Q    And did you assist Officer Meeks related to the arrest of

18 Mr. Hairston?

19 A    Yes, sir.

20 Q    When you arrived on scene, what did you see?

21 A    When I arrived on scene, Officer Meeks was on the ground

22 with Jody handcuffed -- in front of him handcuffed.

23 Q    And did you notice an odor of marijuana coming from

24 Mr. Hairston?

25 A    Yes, sir.

1 Q    Did you notice an odor of marijuana coming from his
2 vehicle?
3 A    Yes, sir.
4 Q    To your knowledge, was there a package with a substance
5 found in a plastic bag?
6 A    Yes, sir.
7 Q    You didn't see whether or not Mr. Hairston had thrown
8 that; is that right?
9 A    No, sir.
10 Q    You just assisted after the fact?
11 A    Correct.
12 Q    And was the extent of your involvement just basically
13 helping with the post arrest of Mr. Hairston on March 13?
14 A    And canvassing the area.
15 Q    When you say "canvassing the area," was that just looking
16 for additional evidence?
17 A    Yes, sir.
18 Q    Did you find anything?
19 A    No, sir.
20 Q    As to September 2 of this year, were you also working on
21 that day?
22 A    Yes, sir.
23 Q    And were you working in a marked patrol unit?
24 A    Yes, sir.
25 Q    In uniform?

1    A    Yes, sir.

2    Q    Did you also have a body-worn camera?

3    A    Yes, sir.

4    Q    Did you all get a call to respond out to the Baymont Inn?

5    A    Yes, sir.

6    Q    And what was that about?

7    A    Two suspicious vehicles that the management had called in

8    about.

9    Q    And was one of those vehicles a gray Nissan Ultima?

10   A    Yes, sir.

11   Q    And that was the vehicle that you ultimately found

12   Mr. Hairston in; is that right?

13   A    Yes, sir.

14   Q    The Baymont Inn, have you responded out to calls for

15   service before there?

16   A    Yes, sir.

17   Q    And how often do you respond out?

18   A    Once or twice a month.

19   Q    And what's the general nature of those calls?

20   A    Drug activity, domestics, trespassing.

21   Q    And about what time of day or night was it when you went

22   out there?

23   A    It was nighttime.

24   Q    And was it before or after 11:00 p.m.?

25   A    It was before.

1  Q    Okay.  When you went to that location, did you go with

2  your emergency lights on?

3  A    No, sir.

4  Q    Did you have your siren on?

5  A    No, sir.

6  Q    And where did you park in relation to the two suspicious

7  vehicles?

8  A    In like a parking lot area.  Not a parking spot, but in a

9  parking lot area.

10 Q    So in the parking lot near those vehicles; is that right?

11 A    Yes, sir.

12 Q    Were you blocking the vehicles in?

13 A    No, sir.

14 Q    And once you got to that back parking lot area of Baymont,

15 what did you do?

16 A    I looked for the vehicles that -- they advised there was

17 two vehicles with the headlights on.  Once we located the

18 vehicles, I got out and made approach.

19 Q    And which vehicle did you approach?

20 A    The Nissan that was closer to my side.

21 Q    Was Officer Meeks also out on the scene?

22 A    Yes, sir.

23 Q    Did he approach the other vehicle?

24 A    Yes, sir, he did.

25 Q    All right.  So you approached the Nissan vehicle; is that

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  right?

2  A    Yes, sir.

3  Q    What did you see?

4  A    As I was approaching, I saw Jody sitting in the front.

5  Q    Did you know Mr. Hairston?

6  A    I did.

7  Q    You obviously mentioned the March date.  Had you had

8  interaction with Mr. Hairston prior to March of this year?

9  A    Yes, sir.

10  Q    Do you recall what the nature of those interactions were?

11  A    It was a couple of different cases I had worked.  One was

12  a drug case, and another one was where a house got shot up.

13  Q    In the drug case was Mr. Hairston charged related to

14  drugs?

15  A    Yes, sir.

16  Q    What type of drugs; do you know?

17  A    It was cocaine.

18  Q    And related to the house being shot up, what was that

19  about?

20  A    It was basically over a drug deal.

21  Q    And how was Mr. Hairston involved?

22  A    He was the shooter.

23  Q    So he was involved with a firearm in that case?

24  A    Yes, sir.

25  Q    And when you approached on September 2 and saw

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  Mr. Hairston, what did you see?

2  A    He was sitting in the driver's seat.  There was a lot of

3  movement going on.  So I asked him why was he moving so much.

4  At this time he advised me that he had just went to Cook Out

5  and got something to eat, in which I did see food in his hand.

6  Q    And did you tell him why you were there?

7  A    I did.  He asked what was going on.  I explained to him

8  that management had called about the suspicious activity of two

9  vehicles being there, and we were just there to find out what

10  was going on.

11  Q    During the course of your interaction with Mr. Hairston,

12  you mentioned that there was movement.  Explain what you're

13  talking about.

14  A    When I first was walking up to him, I noticed that he was

15  reaching over -- he was watching Officer Meeks, and he was

16  reaching over.  And then once Meeks had pointed out to Jody and

17  was pointing towards me, he looked over at me, and when he did,

18  his eyes got real wide.  I asked what was he doing, why he was

19  moving so much, and he advised he was trying to eat his food,

20  that he had just went to Cook Out.

21      As I approached, I noticed that he was, indeed, eating his

22  food.  He asked why I was there.  I explained the circumstances

23  of why we were there and asked for his information.  He went

24  and got his information for me.  I started to call it in with

25  C-Comm, checked his record and everything.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1      As I was checking his information, I took a step back.  I

2 noticed that he continued to move, but now his food was laying

3 down in front of him.

4 Q    And just so this is clear for the record.  When you

5 mentioned that Mr. Hairston moved, like he was reaching, you

6 moved to your right as though indicating a reach toward the

7 center console; is that right?

8 A    Yes, he had placed his food down more in front of him.  As

9 I noticed that he was moving again, he was moving to his right

10 where I could not see his hands.  I stepped around to see his

11 hands to see what he was reaching for, but I was unable to.

12 Q    Why did you care about whether or not a person has

13 something in their hands?

14 A    Safety issues.  Because of, like I said, the dealings in

15 the past, I knew Jody to carry a firearm, and I was worried if

16 he was reaching for a firearm, or if there was something else

17 he might have been trying to get ahold of.  The more I tried to

18 ask him about what he was reaching for, the more he tried to

19 hide his hand and change the conversation.

20 Q    At some point did you ask Mr. Hairston to get out of the

21 vehicle?

22 A    I did, when he would not show me his hand and continued to

23 move.

24 Q    As he was getting out of the vehicle, what, if anything,

25 did you see?

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  A    As he was getting out of the vehicle, I went ahead and
2  grabbed the hand that was closest to me.  He continued to try
3  to hide his hand behind him.  I was trying to look over --
4  Q    Hold on.  So he tried -- you grabbed the hand that was
5  closest to you; is that right?
6  A    Yes, sir.
7  Q    And because he was in the driver's side, was that his
8  right or left hand?
9  A    That was his left.
10  Q    His left hand.  So you grabbed that.  And you said you
11  couldn't see his other hand?
12  A    No, sir, I could not.
13  Q    And it would have been his right hand?
14  A    Correct.
15  Q    And what happened after you grabbed Mr. Hairston's left
16  hand?
17  A    I tried to look over his shoulder, and as I looked over
18  his shoulder, I saw what was a peach-in-color Crown Royal bag.
19  Q    All right.  And then did you and Mr. Hairston have a
20  struggle?
21  A    Yes.
22  Q    Did Officer Meeks help you get control of Mr. Hairston?
23  A    Yes.
24  Q    And after you got control of Mr. Hairston, what did you do
25  with him?

1  A    I took him over to my patrol vehicle where I initiated a

2  search on him before placing him in my patrol vehicle.

3  Q    And then what did you do after you had detained

4  Mr. Hairston?

5  A    I walked back over to the vehicle.  I explained to Officer

6  Meeks what had occurred and what I had seen and that that's

7  what I was looking for.  We started initiating a search for

8  that bag.

9  Q    And were you able to find it?

10  A    Yes, sir.

11  Q    Where was it?

12  A    It was up under the vehicle where the driver would have

13  been sitting at.

14  Q    And after you found it, was it in that same peach color

15  bag that you had seen?

16  A    Yes, sir.  It was a peach Crown Royal bag that I located.

17  Q    What was inside the peach Crown Royal bag?

18  A    It was a crystal-like substance that I have known through

19  my experience was methamphetamine and another bag that was a

20  yellow substance.

21  Q    After that substance was seized, was it placed into

22  evidence?

23  A    Yes, sir.

24  Q    And to your knowledge, was it subsequently sent to the

25  Drug Enforcement Administration lab for testing?

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  A    Yes, sir.

2            **MR. GALYON:**  I am going to mark this as Government's

3  Exhibit 2 for identification and 2A.

4            May I approach the witness, Your Honor?

5            **THE COURT:**  Yes.

6  **BY MR. GALYON**

7  Q    So this is Government's Exhibit 2 for identification, and

8  ask if you recognize what this is?

9  A    Yes, sir.

10  Q    What's that?

11  A    This is the material that I had sent off.

12  Q    When you say the material that you had sent off, this is

13  the drug evidence associated with the case?

14  A    Yes, sir.

15  Q    And based -- this is a plastic bag; is that right?

16  A    Yes, sir.

17  Q    And then inside the plastic bag is a manila envelope; is

18  that right?

19  A    Yes, sir.

20  Q    And there's also a bag -- a plastic bag containing a white

21  substance; is that right?

22  A    Yes, sir.

23  Q    And was this white substance what was in that Crown Royal

24  bag?

25  A    Yes, sir.

1  Q    Was it bagged up in a plastic bag at the time?

2  A    Yes, sir.

3  Q    All right.  And the manila envelope, does it have your

4  name and the date 9/2/2020?

5  A    Yes, sir.

6  Q    Were you responsible for packaging the evidence initially

7  when it was recovered at the scene?

8  A    Yes, sir.

9  Q    And then it was sent to the DEA; is that right?

10 A    Yes, sir.

11 Q    And this packaging is sealed, and it is associated with

12 David Webster, who is a Drug Enforcement Administration agent;

13 is that right?

14 A    Yes, sir.

15 Q    And then there is a lab report that's Government's

16 Exhibit 2A; is that right?

17 A    Yes, sir.

18 Q    To your knowledge, has this drug evidence been in the

19 care, custody, and control of either the Eden Police Department

20 or the Drug Enforcement Administration since it was seized back

21 on September 2 of this year?

22 A    Yes, sir.

23         **MR. GALYON:**  Your Honor, I'm going to ask what's been

24 marked as Government's Exhibit 2 be admitted.

25         **THE COURT:**  Admitted.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1              **MR. GALYON:**  And 2A, Your Honor, is the lab report

2    associated with the case.  I asked that that be admitted as

3    well.

4              **THE COURT:**  Admitted.

5    **BY MR. GALYON**

6    Q    You mentioned during the course of your testimony that you

7    had a body-worn camera back on September 2 of this year; is

8    that right?

9    A    Yes, sir.

10             **MR. GALYON:**  May I approach one more time?

11             **THE COURT:**  Yes, you may.

12   **BY MR. GALYON**

13   Q    Showing you Government's Exhibit 3 for identification, and

14   ask if you recognize what that is?

15   A    This is the CD from the footage.

16   Q    And how do you recognize it?

17   A    It has my initials on it.

18   Q    Did you have an opportunity to review that DVD, or CD, to

19   verify that that was the footage from September 2 of this year?

20   A    Yes, sir.

21   Q    And you mentioned that it has your initials on it to

22   verify that you had an opportunity to review it?

23   A    Yes, sir.

24   Q    The CD says "Hairston" associated with this Defendant Jody

25   Hairston; is that right?

1  A    Yes, sir.

2  Q    It also an MP4 file name associated with the case; is that

3  right?

4  A    Yes, sir.

5         **MR. GALYON:**  I'm going to ask that what's been marked

6  as Government's Exhibit 3 be admitted.

7         **THE COURT:**  Admitted.

8       (Government's Exhibit 3 played.)

9  **BY MR. GALYON**

10 Q    The person in the video -- we're now 32 seconds into the

11 video.  The person that you saw in the driver's seat, who is

12 that?

13 A    Jody Delano Hairston.

14 Q    Do you recognize Mr. Hairston in the courtroom?

15 A    Yes, sir.

16 Q    Where is he seated?

17 A    On the side right here.

18 Q    And what's he wearing?

19 A    In the video.

20 Q    No, today.

21 A    Like a blue shirt.

22 Q    Okay.

23      (Government's Exhibit 3 played.)

24      And now we're 1 minute and 28 seconds into the video.

25      In the video can you see that Mr. Hairston has something

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1   in his hand?

2   A    Yes, sir.

3   Q    What's that?

4   A    It's food.

5        (Government's Exhibit 3 played.)

6   Q    And now we're 1 minute and 47 seconds in.

7        There was some discussion of that Griffin truck; is that

8   right?

9   A    Yes, sir.

10  Q    What's that about?

11  A    It's what the management advised the vehicles were parked

12  beside.

13  Q    To clarify about where the suspicious vehicles were?

14  A    Yes, sir.

15  Q    And in the video, here at 1 minute and 47 seconds, can you

16  see a vehicle that's associated with Griffin?

17  A    Yes, sir.

18  Q    Where is that?

19  A    It's actually where Officer Meeks is standing.  It's right

20  behind him.

21  Q    Is that a white truck?

22  A    Yes, sir.

23  Q    And you can -- can you see that there is a little bit of

24  writing on the driver's side door of that white truck?

25  A    Yes, sir.

1  Q    Is that the truck you're talking about?

2  A    Yes, sir.

3  Q    Okay.  So basically two cars away from where

4  Mr. Hairston's vehicle is?

5  A    Yes, sir.

6  Q    Okay.

7       (Government's Exhibit 3 played.)

8       And now we're 2 minutes and 27 seconds in.

9       You're talking to Mr. Hairston about management calling

10 related to both of the vehicles, that is, the vehicle he's in

11 and the vehicle that is the white vehicle parked beside of him;

12 is that right?

13 A    Correct.

14 Q    And as part of what you're doing, do you have some of

15 Mr. Hairston's paperwork that you're looking at?

16 A    I do.

17 Q    Okay.  So there's -- because it looks like there's some

18 paperwork in your hand; is that right?

19 A    Yes, sir.

20 Q    What is that paperwork associated with?

21 A    One is his driver's license I'm sure.

22      (Government's Exhibit 3 played.)

23 Q    And during this time that you're standing by with

24 Mr. Hairston, is Officer Meeks talking to the two women in the

25 other vehicle?

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 43 of 80

1   A    Yes, sir.

2   Q    So you're just standing by and you're checking

3   Mr. Hairston's information; is that right?

4   A    Yes, sir.

5        (Government's Exhibit 3 played.)

6   Q    And now we're at 3 minutes and 19 seconds.

7        You've got your flashlight with you; is that right?

8   A    Yes, sir.

9   Q    And you're shining it toward the interior of the vehicle;

10  is that right?

11  A    Yes, sir.

12  Q    Why are you doing that?

13  A    That's when the movement starts.

14       (Government's Exhibit 3 played.)

15  Q    And now you've asked Mr. Hairston to step out at about 3

16  minutes and 22 seconds; is that right?

17  A    Yes, sir.

18  Q    And why did you do that?

19  A    Because the movement continued.

20  Q    When you say "the movement continued," were you able to

21  see Mr. Hairston's hands?

22  A    No, I could not see his hands.

23       (Government's Exhibit 3 played.)

24  Q    And now we're at 3 minutes and 26 seconds.

25       Is Mr. Hairston out of the vehicle?

 1  A    Yes, sir.

 2  Q    Is he facing toward you?

 3  A    Yes, sir.

 4  Q    And while he's doing so, can you see his hands?

 5  A    No, sir.

 6  Q    At this point have you grabbed one of his hands?

 7  A    I have.

 8  Q    Okay.  And which hand was that, just to be clear?

 9  A    The left hand.

10  Q    The left hand?

11  A    Yes, sir.

12       (Government's Exhibit 3 played.)

13  Q    Now, we're about 3 minutes and 44 seconds into the video.

14       And Mr. Hairston has raised his voice; is that right?

15  A    Correct.

16  Q    And what does he say?

17  A    He's saying he didn't have anything in his hand, why we

18  messing with him.

19  Q    And at this point Officer Meeks has come over to assist;

20  is that right?

21  A    Yes, sir.

22  Q    And Mr. Hairston is sort of crouching down during the

23  interaction; is that right?

24  A    Yes, sir.

25  Q    Is he trying to get away from your handhold?

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 45 of 80

```
 1   A     He was trying to keep his right hand away from me.
 2         (Government's Exhibit 3 played.)
 3   Q     And now we're 4 minutes and 54 seconds into the video.
 4         And Mr. Hairston -- is he talking about whether or not
 5   he's got a room there?
 6   A     Correct.
 7   Q     Does he have a room at the Baymont Inn?
 8   A     No, sir.
 9         (Government's Exhibit 3 played.)
10   Q     Now we're at 4 minutes and 58 seconds on the video.
11         Who is the officer in the video?
12   A     That's Lieutenant Welch.
13         (Government's Exhibit 3 played.)
14   Q     Now we're at 7 minutes into the video.
15         And there's some discussion between you and Mr. Hairston
16   about you previously chasing him; is that right?
17   A     Yes, sir.
18   Q     When was that; do you know?
19   A     It was a couple of years ago, several years.
20         (Government's Exhibit 3 played.)
21   Q     Now we're at 7 minutes and 32 seconds.
22         And you say -- what did you just say there?
23   A     I told him, "It looked like a peach bag."
24   Q     Meaning the color peach?
25   A     Yes, sir.
```

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

```
 1        (Government's Exhibit 3 played.)
 2   Q    And there you say, "A crown royal bag is what I saw him
 3   have"?
 4   A    Yes, sir.
 5        (Government's Exhibit 3 played.)
 6   Q    Now we're at -- I'm going to back it up just a little bit.
 7   And there at 7:44 or 7:43 thereabouts on the video, what did
 8   you see in the frame?
 9   A    A peach Crown Royal bag.
10   Q    And where is it in relation to the driver's side door?
11   A    Under the vehicle -- or the seat.
12        (Government's Exhibit 3 played.)
13   Q    And we're now at 7 minutes and 52 seconds into the video.
14        And there's a peach bag that has like a drawstring at the
15   top; is that right?
16   A    Yes, sir.
17   Q    And that's the bag that subsequently had Government's
18   Exhibit 2, this evidence; is that right?
19   A    Yes, sir.
20   Q    So inside that bag was the methamphetamine?
21   A    Yes, sir.
22   Q    Okay.  Did you have an opportunity to review the body-worn
23   camera footage from Officer Meeks' body-worn camera?
24   A    No, sir.
25   Q    All right.  And after you retrieved this item, you had it
```

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  packaged up, and it was sent to DEA; is that correct?

2  A    Correct.

3  Q    Today before court, did you have an opportunity to look at

4  the body-worn camera footage of Officer Meeks?

5  A    Yes, sir.

6  Q    And did you see the same orange bag in Mr. Hairston's hand

7  as it was dropped?

8  A    Yes, sir.

9  Q    Okay.

10         **MR. GALYON:**  I don't have anything further, Your

11  Honor.

12         **THE COURT:**  Any cross, Mr. Crump?

13         **MR. CRUMP:**  Yes.

14                       CROSS-EXAMINATION

15  **BY MR. CRUMP**

16  Q    Sergeant Pruitt, on September 2 of this year, did you have

17  any information that Jody Delano Hairston was at the Baymont

18  Inn before you arrived at the Baymont Inn?

19  A    No, sir.

20         **MR. CRUMP:**  Your Honor, that's all.

21         **THE COURT:**  All right.  You may step down, sir.

22      (At 2:41 p.m., witness excused.)

23         **THE COURT:**  Anything further from the Government?

24         **MR. GALYON:**  No, Your Honor.

25         **THE COURT:**  Do you have any evidence you wish to

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 48 of 80

1  present?

2          **MR. CRUMP:**  Can I have about two minutes?

3          **THE COURT:**  Yes, sir.

4      (Mr. Crump conferred with the Defendant.)

5          **MR. CRUMP:**  Your Honor --

6          **THE COURT:**  Give me just a minute, please.

7      (Off-the-record discussion.)

8          **THE COURT:**  All right.  Mr. Crump?

9          **MR. CRUMP:**  Yes, Your Honor, we call Jody Hairston to

10 testify for the defense.

11         **THE COURT:**  All right.  Why don't we take a 5-minute

12 break while Ms. Engle cleans the witness stand.  If you need to

13 take a comfort break, do it now.

14     (The court recessed at 2:44 p.m.)

15     (The court was called back to order at 3:00 p.m.)

16     (The Defendant was present.)

17         **THE COURT:**  All right.  Are we ready to proceed?

18         **MR. CRUMP:**  Yes.

19         **THE COURT:**  Mr. Hairston may step up to the stand.

20 He needs to be sworn first.

21         You may remove your mask, sir, while you're

22 testifying.

23         All right.  Please proceed.

24 **JODY DELANO HAIRSTON**, DEFENDANT'S WITNESS, being first duly

25 affirmed, at 3:00 p.m. testified as follows:

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1                        DIRECT EXAMINATION

2    **BY MR. CRUMP**

3    Q    State your name for the Court.

4    A    My name is Jody Delano Hairston.

5    Q    Mr. Hairston, where do you live?

6    A    Eden, North Carolina.

7    Q    And on September 2 of this year, did you have occasion to

8    to be at the Baymont Inn in Eden?

9    A    Yes, sir.

10   Q    About what time did you arrive at the Baymont Inn?

11   A    I know it was sometime after 10:00.

12   Q    Okay.  And what was your purpose in going to the Baymont

13   Inn?

14   A    Well, I talked to Kanesha Hart, and her and Christie Smith

15   was there.  Kanesha had a room, and I was, like, well, I might

16   get me one there as well.  And that's when I was at Taco Bell,

17   and then I went to Cook Out.  And then I pulled up to the Cook

18   Out -- I mean to Baymont Inn.  And they were sitting there back

19   into the thing, and then I backed up right behind them.

20   Q    Okay.  And on that occasion, did you have a Crown Royal

21   bag in your vehicle or in your possession?

22   A    There was a Crown Royal bag in my possession.

23   Q    And did you have any methamphetamine, heroin, or any

24   illegal drugs in your possession?

25   A    No, sir.

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 50 of 80

1  Q    Which car was there first, the white car with Ms. Smith or

2  your car?

3  A    When I pulled up, Ms. Smith and Kanesha Hart was already

4  there.

5  Q    Okay.  Did you see a Crown Royal bag at any time?

6  A    There was never no Crown Royal bag at all.  This surfaced

7  after Meeks -- I don't know what's going on.  I don't have any

8  idea, but there was no Crown Royal bag in my car.

9           **MR. CRUMP:**  Your Honor, that would be all.

10           **THE COURT:**  Cross?

11           **MR. GALYON:**  Yes, just briefly.  Thank you.

12           Ms. Engle, if you could play the video.

13                         CROSS-EXAMINATION

14  **BY MR. GALYON**

15  Q    So, Mr. Hairston, can you see that big screen TV that's to

16  your left?

17  A    Yes, sir.

18  Q    And so this is from the video from Officer Meeks'

19  body-worn camera for September 2 of 2020.  It's previously been

20  admitted as Government's Exhibit 1.  And we're at 3 minutes and

21  56 seconds into the video.

22       Do you recognize that your car is the vehicle there on the

23  left?

24  A    Yes, sir.

25  Q    Okay.  And it's a gray Nissan Ultima 2019; is that right?

Case 1:13-cr-00054-TDS   Document 47   Filed 01/20/21   Page 51 of 80

1   A    No, sir.

2   Q    It's not?

3   A    No.  It's blue.

4   Q    It's blue?

5   A    Yes.

6   Q    And it's a Nissan Ultima?

7   A    Yep.

8   Q    Is it 2019?

9   A    Yes, sir.

10  Q    Okay.  And were you driving it that night?

11  A    Yes, sir.

12  Q    Were you the only person in the vehicle when you came into

13  contact with law enforcement?

14  A    When I get to the Baymont -- I drove my car to the Baymont

15  by myself.

16  Q    Okay.  So you were the only person in the car?

17  A    Yes, sir.

18  Q    And here at 3 minutes and 56 seconds into the video, do

19  you see there on the far left side of the screen sort of where

20  the driver would be there's an orange-looking bag?  Is that

21  right.  Do you see that or no?

22  A    No, I don't -- I see what you're saying.  That's not a bag

23  that's in my hand.

24  Q    Okay.  All right.  So I want you to watch this video.

25  A    Right.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1          (Government's Exhibit 3 played.)
2    Q    Are you saying that wasn't a bag in your hand?
3    A    No, sir.
4    Q    Okay.  We're going to look at this video one more time.
5          (Government's Exhibit 3 played.)
6    Q    Okay.  And you're saying that --
7    A    That's not a Crown Royal bag that's in my hand, no, sir.
8    That was my Taco Bell.  It had to be.  It was not no Crown
9    Royal bag.
10   Q    So we're going to look at it one more time.  You're saying
11   that that was your Taco Bell bag?
12   A    That's not -- I mean, I didn't have no Crown Royal bag in
13   my possession, period.
14         (Government's Exhibit 3 played.)
15   A    See, that's my Taco Bell food right there.
16   Q    So your testimony is that the orange bag that was in your
17   right hand --
18   A    That wasn't a bag that was in my hand.  That was my food
19   from Taco Bell.
20   Q    Okay.  So that was your food from Taco Bell --
21   A    Yes.
22   Q    -- in that orange thing; is that right?
23   A    Right.  And that's what I am trying to figure out.  Where
24   is it?  Because when they come back, that bag -- what I dropped
25   is not right there, period.  You can see the footage.  So where

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 53 of 80

1  did that surface from?

2  Q    Right.  And so that same orange thing is then found under

3  the driver's side of your vehicle; isn't that right?

4  A    Right, I guess, but what I'm saying is that -- if I

5  dropped that bag right there when I got out of the car --

6  Q    Yes, sir.

7  A    -- why isn't it there when they come back and they are

8  searching my vehicle and trying to find -- if I dropped it when

9  I got out of the car?  I didn't drop any drugs at all.

10 Q    Okay.

11 A    I mean, look at the video.  When you come back, it's not

12 there.

13      (Government's Exhibit 3 played.)

14 Q    This is from Government's Exhibit 3, the video from

15 Officer Pruitt, and we're at about 7 minutes and 28 seconds in.

16      So this same orange thing that was in your hand is now

17 under that car at 7 minutes and 47 seconds into the video; is

18 that right?

19 A    I just seen the video, and it was showing beside my car

20 where I got out of the car at, and there was nothing there.

21 Q    Okay.  Right.  That's right.  There's nothing beside the

22 car.  It's under the car; is that right?

23 A    Why would it be?  If I had it and I dropped it on the

24 ground, why would it be under my car?

25 Q    Okay.

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 54 of 80

1  A    A bag with 154 grams of methamphetamines, I'm pretty sure

2  that that's heavy.  What is it doing in my car if I dropped

3  it --

4  Q    Right.

5  A    -- if I dropped it?  It's not a ball.  It don't roll.

6  Q    Right.

7  A    Why isn't it there -- well, I didn't drop any drugs or

8  Crown Royal bag out of my hand.  Why isn't it there?  That's

9  why I'm saying.  I saw Meeks several times go back and forth.

10 I don't know what's up with him, but I know that me and Meeks

11 grew up together as kids.  And he get up here on this stand and

12 he don't tell the truth.  I've known Meeks since I was five

13 years old.  We've had several quarrels in the neighborhood.  He

14 knows me personally, but he got up there and said he didn't

15 know me before prior to March 13.  Pruitt as well.

16     But what I'm saying is if I dropped a bag of 154 grams,

17 sir, it's not going anywhere.  It's going to be right there

18 where I dropped it at.

19     I didn't have any drugs on me.  I don't know if it was

20 there prior to I got there, whether Meeks and them put it

21 there.  I don't sell drugs.  If you ask any of these guys in

22 Eden, I haven't sold drugs since I got out of federal prison.

23 Q    Okay.  Your testimony is that --

24 A    I work.

25 Q    -- you haven't sold drugs since you got out of federal

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  prison?

2  A    I work.

3  Q    And where were you living back on September 2 of this

4  year?

5  A    At my grandfather's house.

6  Q    Okay.  And is that in Eden?

7  A    Yes, sir.

8  Q    And was it your testimony that you thought about getting a

9  room that night at the Baymont Inn, that you might get a --

10 A    I was going to get a room that night because my uncle had

11 brought all his kids and stuff up from Reidsville and I had

12 court the next morning, so I needed to get some rest so I could

13 go to court for the March 13 incident with Meeks.

14 Q    And back on March 13 of this year, is it your testimony

15 that you didn't have drugs on that occasion?

16 A    Never did I have any drugs or did I commit a crime or

17 break any law or was I ever detained or was I -- ever said any

18 kind of probable cause.  Mr. Meeks walked on me and asked me

19 have I seen a missing dog.  I said no.  He assaulted me.  He

20 pulled up.  He asked me have I seen a missing dog.  I said,

21 "No, sir.  I am trying to take my son to this fair.  That's

22 where I am on the way to."  Once I said that, he grabbed my

23 right hand.  I have video footage of this.  I sent this to my

24 probation officer.  I actually have it on my phone.

25       As soon as he walks up to my car, he asked me that

1  question, and he proceeds to grab my hand.  I pulled back.  I

2  said, "What are you doing?  What did I do?"  He said, "Give me

3  your hands."  And I said, "For what?"  And he lunged out at me,

4  and I never had nothing in my hands, period.  He tried to grab

5  my hands for no reason.  I mean, he never said any kind of --

6  he -- nothing.  I never committed a crime.  He never said I

7  committed a crime or no -- because if probable cause -- as a

8  police officer, if you smell marijuana, the first thing you do:

9  Sir, I smell marijuana.  Have you been smoking?  Do you have

10  any on you?  Can I search your property?

11       That is the law.  He did none of that stuff, and I didn't

12  have anything in my hand.

13       And, furthermore, he found an open container in the

14  backseat of the car and charged me with it for no reason, no

15  reason.  I just did seven years.  I'm not trying --

16  Q    And did you say that your son was with you that day?

17  A    I was on the way to take him to a fair.  He stays in

18  Danville.

19  Q    Okay.  So he wasn't with you.  You were the only person in

20  the car?

21  A    Yeah, I was actually driving my baby mother's car, the Kia

22  Optima.

23  Q    And were you smoking marijuana that day?

24  A    No, sir.

25  Q    Did you have any marijuana on you?

1  A    No, sir, I never did.  And he's trying -- what he has

2  testified is that he was behind the store, and I'm coming up

3  Friendly Road and he -- I heard you ask him.  He said I was

4  10 feet.  He's in his car, sitting in his car.  I'm coming up

5  Friendly Road.  Where is that a 10-feet distance, period?  And

6  then I pulled into the store to get gas.  Meeks pulled in

7  behind me -- he didn't pull in behind me.  He pulled out, went

8  to the stop sign, sat for like 30 seconds, and then pulled into

9  the neighborhood across the street where we grew up from, me

10  and Mr. Meeks.

11       And then I went in the store and gave them $10 on pump

12  one, come back, put the gas pump in there, let it pump.  My

13  phone rung.  I answered the phone.  At that time Meeks pulled

14  up, and that's where he asked me have I seen a missing dog?  I

15  said no.  He proceeded to assault me basically, because if I

16  touch you without a warrant, without cause, without letting you

17  know, that's assault.

18  Q    And --

19  A    And I went to file a complaint, and it never went

20  anywhere.  But I also know that Mr. Meeks has several

21  complaints against him in the Eden Police Department.

22  Q    And is it your testimony that you believe the officers

23  planted the drugs on the September 2 occasion?

24  A    It's my testimony that either they were planted or they

25  were there.  It's my testimony that those drugs did not belong

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 58 of 80

1  to me.

2  Q    And you were on federal supervised release related to a

3  drug offense that you pled guilty to; is that right?

4  A    In 2011 -- well, I pled guilty in 2013, yes, sir.

5  Q    And then you also had a firearm on that occasion; is that

6  right?

7  A    Yes, sir.

8       Can I say something?

9  Q    Sure.

10  A    The drugs that I was sent to the feds for was two 20 rock

11  of crack, $40 --

12  Q    Okay.

13  A    -- with a firearm, and I got seven years.  Two of probably

14  .4, a half a gram of cocaine, and I got seven years.

15  Q    All right.  And at the time that you committed that

16  offense, were you a previously convicted felon?

17  A    From when I discharged the weapon after I got shot.  And

18  it wasn't a drug deal.  Somebody had come to try to rob my

19  grandpa's house and shot me.

20  Q    And so as a result of that discharge, you then were a

21  convicted felon at the time of your federal offense; is that

22  right?

23  A    Yes, sir.

24  Q    Okay.

25  A    I was 18 at the time.

Case 1:13-cr-00054-TDS    Document 47    Filed 01/20/21    Page 59 of 80

1          **MR. GALYON:**  I don't have anything further.  Thank

2    you.

3          **MR. CRUMP:**  No further questions.

4          **THE COURT:**  You may step down, sir.

5       (At 3:15 p.m., witness excused.)

6          **THE COURT:**  Any other evidence from the Defendant?

7          **MR. CRUMP:**  No, Your Honor.

8          **THE COURT:**  All right.  I would be happy to hear from

9    you as to what you argue the evidence shows.  I guess I'll

10   start with the Government.

11         **MR. GALYON:**  Your Honor, I'll start obviously with

12   the September 2 issue and really just highlight the -- what the

13   video evidence shows.

14            And, that is, that while these two officers are out

15   at the location on September 2, that because Sergeant Pruitt,

16   who is directly involved with Mr. Hairston at the location,

17   sees him reaching and hiding his hands toward the center

18   console, that the officer asks him to step out.  And,

19   obviously, you heard the testimony that he had significant

20   interaction with him before.  He was aware and knew of and

21   involved in the discharging incident.  He knew that he had been

22   involved in drug activity previously.

23            He asked him to step out, and when he did, that he

24   could not see Mr. Hairston's right hand, that he grabbed ahold

25   of his left hand as he got out.  And in the video -- in

         US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  Mr. Meeks -- Officer Meeks' video, you can see that there is in

2  Mr. Hairston's right hand an orange bag, for lack of a better

3  word, and that he drops it.

4         And, Your Honor, because you can't see everything in

5  the video, I would certainly contend to you that that's the

6  point at which Mr. Hairston drops the bag and deals with the

7  officer.  As you can see on the video, he squats down.  I would

8  argue that what's going on there is he's making sure that he

9  moves the bag out of the way so that the officers can't see it

10 or get to it.  It's in that exact same spot right under the

11 driver's side door when they search.

12        The argument that these officers planted 154 grams of

13 methamphetamine on Mr. Hairston is ludicrous.  And if we look

14 at the video, the one thing that you can see in the early part

15 of the video of Mr. Hairston is that the bag that he has is a

16 yellow bag, not orange, and a wrapper associated with Cook Out.

17        And so I would argue to you that his claim on the

18 stand that either these officers planted it or that he just in

19 no way had any connection with the orange or peach bag that

20 contained all the methamphetamine is inconsistent with the

21 video evidence, and it is inconsistent with what happened that

22 night.

23        Your Honor, the other evidence associated with

24 Mr. Hairston's incident on March 13, similarly, Mr. Hairston's

25 trying to distance himself from the drug evidence.  It's the

1  same sort of thing in that he resists, that the officer

2  subsequently is able to detain him, but not until he's actually

3  able to get rid of the bag, typical sort of throw-down case,

4  and then the officers are able to retrieve that bag that

5  contained the heroin.

6          Your Honor, I would argue that as to those incidents,

7  and primarily the September incident because that's going to be

8  the driver associated with the Grade A violation, that the

9  evidence is very strong that Mr. Hairston was in possession of

10  that peach or orange bag that contained the drugs and that that

11  was a distribution amount.  That's 154 grams of

12  methamphetamine, which is by no means a personal use amount;

13  and that based on that conduct, that he should be violated and

14  revoked as to his supervised release violation.

15          Thank you, Your Honor.

16          **THE COURT:**  Mr. Crump?

17          **MR. CRUMP:**  Your Honor, Mr. Hairston was strong and

18  clear in his testimony that he's not guilty.

19          And as to March 13, he was not under arrest, you

20  know, when he left the officer and don't know if there's any

21  evidence of -- I question whether there's any evidence of

22  heroin on March 13, but his testimony is clear that he did not

23  have a Crown Royal bag, did not have drugs.

24          **THE COURT:**  Going back here, you said there's no

25  evidence on March 13, but the officer testified he field-tested

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1   it; right?  The officer said it field-tested, and it tested

2   positive for heroin; correct?

3           **MR. CRUMP:**  I'm not going to dispute that.  I don't

4   know -- I'm not going to dispute that.

5           **THE COURT:**  I am trying to understand the basis of

6   your statement.

7           **MR. CRUMP:**  For lack of a better example, it's like

8   Michael Jordan palmed the ball; the referees didn't call it.

9           To speed things up a lot, Mr. Galyon correctly led

10  witnesses.  I'm not accusing the Government of any misleading,

11  but I'm uncertain whether the officer responded to Mr. Galyon's

12  kind of leading question, or he said it was field-tested.  I'm

13  uncertain about the heroin on March 13.

14          **THE COURT:**  Your client --

15          **MR. CRUMP:**  I'm not disputing --

16          **THE COURT:**  Hold on just minute.  He was having a

17  conversation with somebody.

18          **THE DEFENDANT:**  I'm sorry.  I was just trying --

19          **THE COURT:**  Are we done?

20          **THE DEFENDANT:**  Yes, sir.

21          **THE COURT:**  Okay.  If you'll wait just a minute, let

22  me hear from your lawyer.

23          **MR. CRUMP:**  I'm not disputing the Court's

24  recollection.

25          **THE COURT:**  Well, I'm just trying to understand the

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1 basis for your statement.  You argue that there's some question

2 about whether there's evidence of it, and I was trying to

3 understand what you mean by that.

4         **MR. CRUMP:**  I'm uncertain whether there was evidence

5 of heroin on March 13.

6         **THE COURT:**  Okay.  And --

7         **MR. CRUMP:**  I might not have heard the evidence

8 correctly.

9         **THE COURT:**  I thought I heard the witness to say he

10 field-tested it because I specifically, I think, asked a

11 question, and I thought that's what he went back and stated.

12         Am I wrong about that?  I will go back and read

13 the --

14         **MR. CRUMP:**  No, I'm not saying the Court is wrong.

15 I'm just saying that I don't recollect that.

16         **THE COURT:**  If, in fact, that's what was testified

17 to, then what's your argument?

18         **MR. CRUMP:**  Well, our argument would go to two

19 things.  Mr. Hairston consistently said he didn't have drugs.

20 So we argue that's the Defendant's evidence; he did not have

21 drugs either on March 13 or on September 2.  That's our

22 argument.

23         **THE COURT:**  All right.

24         **MR. CRUMP:**  Your Honor, he has admitted to two other

25 violations, Violations 3 and 4.

Case 1:13-cr-00054-TDS     Document 47     Filed 01/20/21     Page 64 of 80

1    **THE COURT:**  All right.  Before I go any further, I
2  want to ask a question.
3          The lab report on the methamphetamine, I think, is
4  that what -- that lab report G-2A?
5          **MR. GALYON:**  Yes, Your Honor.
6          **THE COURT:**  Can I see that for a minute?
7     (Pause in the proceedings.)
8          **THE COURT:**  Okay.  It came in without objection.  So
9  here's my question.  I am going to treat it as admitted without
10  objection.  Under Rule 32.1(b)(2)(C), it's hearsay.  The
11  question is whether the -- whether I can consider it at this
12  point or whether I have to conduct a balancing test to
13  determine whether it comes in.  The balancing test would be the
14  question of the reliability of the evidence plus the
15  Government's proffered reason for why the witness is not here
16  to testify to it, which I don't have any statement as to right
17  now.
18          **MR. GALYON:**  Right.
19          **THE COURT:**  So one question I have is is that waived
20  in the Fourth Circuit if there is no objection?  And, two, if
21  it's not waived, then what's the Government's proffer on that?
22          **MR. GALYON:**  Right.  So in preparation for the
23  hearing, I had subpoenaed Ross Gordon, who is the chemist with
24  the Drug Enforcement Administration, and was prepared to have
25  him come and testify.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1    **THE COURT:**  So this test was performed by the United

2    States Department of Justice, Drug Enforcement Administration?

3         **MR. GALYON:**  That's correct.  And Ross Gordon on that

4    report is the chemist who conducted the test.  He works at the

5    Drug Enforcement Administration lab in Largo, Maryland, and we

6    were prepared to have him come for this hearing.

7         My understanding from my discussions with Mr. Crump

8    were that his presence would not be needed because we had the

9    lab report, and so I didn't have him testify here today.

10        **THE COURT:**  Okay.  Is that your position in the case?

11        **MR. CRUMP:**  That's correct, Your Honor.  And we did

12   not make an objection and have no doubt that if that chemist

13   came that he would so testify.  I don't question his

14   reliability as to what the substance is.

15        Mr. Hairston -- it's my understanding he's not

16   objecting to the substance being drugs.  He's just saying it's

17   not his.

18        **THE COURT:**  I understand.

19        All right.  Well, I'm going to make a finding under

20   Rule 32.1(b)(2)(C) for the record that I find the report to be

21   reliable.  It is the U.S. Department of Justice, Drug

22   Enforcement Administration, and the report itself appears to

23   indicate in the remarks the net weight of the drugs and then

24   the -- that it was conducted with 95 percent level of

25   confidence, that the test was performed by an adequate --

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

represented to be performed by an adequate method.  That's gas
chromatography and gas chromatography and mass spectrometry and
infrared spectrometry, and so I find it to be reliable
evidence.

It's a question of whether the Government has
proffered an adequate reason for not calling the witness.  I am
going to find that the Government has proffered an adequate
reason, that it had subpoenaed the witness, but the Defendant
doesn't contest the validity of the report, and that bringing
the witness here would have been unnecessary under these facts.

I'm going to find by a preponderance of the evidence
that the Defendant did violate these conditions of his
supervision.  He did admit to two of the violations.

Hold on just a minute.  Let me get my notes back
together.

He admitted -- No. 1 has been -- Violation 1 has been
dropped by the Government, so we're talking about two through
five.  He admitted three and four.  And four, by the way, is a
positive test for marijuana on two separate occasions in the
fall of 2019.  That's somewhat relevant because he was -- it
was alleged that he was stopped because there was an odor of
marijuana coming from his car in this case in March of 2020,
and that's certainly relevant to that.

Violation 2 and Violation 5 I find as well, that the
preponderance of the evidence -- it's not beyond a reasonable

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  doubt; it's a preponderance standard at this stage of the

2  proceedings, which is 50 percent plus one.  And it does

3  indicate that the Defendant did violate the conditions.

4         I take the testimony of Officer Meeks and Officer

5  Pruitt to be credible.  And Officer Meeks did testify that

6  he -- on March 13, 2020, did smell marijuana emanating from the

7  Defendant's vehicle, that he arranged a consensual encounter at

8  the gas station and still smelled the marijuana not only on the

9  Defendant, but in the vehicle; that the Defendant tried to

10 run -- flight is usually a sign of culpability -- and had

11 something in his hand and dropped it, and that it was

12 field-tested, and it field-tested positive for heroin.  And

13 that was my recollection that he did testify that there was a

14 field test.  It was also sent off to the SBI, but for purposes

15 of these proceedings, there was a field test, and that's

16 evidence of heroin.  As to -- I don't recall whether he

17 testified to an amount of the heroin at this point.

18        As to the September 2, 2020, encounter, the facts

19 indicate by a preponderance that the officers approached the

20 two vehicles, one of which was an Ultima with the Defendant.

21 And then as the Defendant exited the car, he's clearly seen to

22 be possessing a peach-colored bag in his right hand.  After

23 he's eventually coached out of the car, the bag ends up being

24 dropped.  It's found shortly after that under the driver's door

25 area and slightly under the car, which is consistent with the

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1   Defendant having dropped it there.  The Defendant did resist

2   substantially when he was pulled out of the car.  The bag was

3   tested, and it contained 150.97 grams net weight of

4   methamphetamine hydrochloride.

5           Now, I don't have any result, I don't believe, as to

6   the heroin.  Do I have any?

7           **MR. GALYON:**  No, that's correct.  There is not.

8           **THE COURT:**  So that's as to the methamphetamine.

9           So I find the testimony of the officers to be

10  credible as to their encounters with Mr. Hairston in these two

11  situations.

12          As to the Defendant's encounter, it's much less

13  credible that the Defendant -- his version of the facts,

14  particularly as to the September date, that somehow the bag was

15  just there, which would be highly unusual to have a bag sitting

16  in a parking lot containing methamphetamine; or, two, that the

17  officers planted it on him, and there is no evidence that the

18  officers did that.  That is flatly inconsistent with the video

19  from the body cam.

20          All right.  So having found both of those then, I

21  believe that the calculations under the guidelines need to be

22  made.  So let me do that real quick.

23          It appears that Mr. Hairston -- well, let me say then

24  I find by the preponderance of the evidence he violated the

25  valid conditions of his supervision for Violations 2 through 5,

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1  and they were willful and without lawful excuse.

2          So the original conviction for -- there were two of

3  them, the drug charge and the gun charge.  Count One was a

4  Class C felony.  Count Two is a Class A felony, I believe.  He

5  was a Criminal History Category V.  The most serious violation

6  alleged appears to be a Grade A violation, the methamphetamine,

7  which is a distribution amount.  Under the Guidelines 7B1.4,

8  which are advisory, the range is 30 to 37 months.  The maximum

9  that can be imposed is 60 months.  The terms of supervised

10 release that can be imposed are 60 months on Count Two, 24

11 months on Count One, but then subtracting out from those the

12 amount of any imprisonment time, if I impose it at this time.

13         Do you agree that in light of my rulings those are

14 the calculations?

15         **MR. CRUMP:**  Your Honor, the Defendant agrees with the

16 Court's determination as to the advisory policy guidelines.

17         **THE COURT:**  Okay.  All right.  How about the

18 Government?

19         **MR. GALYON:**  Yes, Your Honor.

20         **THE COURT:**  All right.  So now I'll be happy to hear

21 from you as to an appropriate disposition.

22         Mr. Crump, do you want to go first or second?

23         **MR. CRUMP:**  Your Honor, I will go first.

24         He asks for the lowest sentence as the Court could

25 see fit.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1          He has a lot going for him.  He's almost -- he's 33,
2    almost 34.  He is a high school graduate.
3          **THE COURT:**  I saw that.
4          **MR. CRUMP:**  I think that graduating from high school
5    might be the biggest achievement somebody can make.  It is a
6    social networking.  If you can make your way through it at kind
7    of a difficult age, it speaks well of somebody.
8          I thought it was remarkable when I read the
9    presentence report that he attended 25 courses in firefighting
10   and rescue at Robinson Community College.
11         One thing that helps Mr. Hairston is his foster
12   parent, Lane Wilkins, and he's still in his life.  He has a
13   construction company, and Mr. Hairston has continued to work
14   for him.
15         **THE COURT:**  Is that where he was working at the time?
16         **MR. CRUMP:**  He still works for Mr. Wilkins.
17   Mr. Wilkins is still supportive.
18         He went and got -- is working on a commercial
19   driver's license, and but for the COVID-19 pandemic, he would
20   likely have that commercial driver's license.
21         The one -- the other one thing notable that I saw
22   just reading it one time -- I might be wrong, but in looking at
23   his criminal history, he was violated -- there was one case
24   that he was violated twice, but they continued him on
25   probation, but he was never violated and sent back to prison,

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1 at least that was my first reading of his presentence report.

2 I think that's pretty remarkable.  The sad thing was he kept

3 getting into trouble, but quite a few times he would be placed

4 on probation, and he would not be revoked and sent back to

5 prison.

6 　　　　　He wants to get on with his life.  He wants to get

7 this behind him, and, again, he just asks the Court to impose

8 as lenient a sentence as the Court can see fit.

9 　　　　　**THE COURT:**  All right.  Thank you very much.

10 　　　　　Mr. Galyon?

11 　　　　　**MR. GALYON:**  Your Honor, I would agree with

12 Probation's assessment related to a sentence at the high end as

13 to Count Two.  That's going to be 37 months, and we would ask

14 the Court to impose that.

15 　　　　　You know, the sad truth of it is that Mr. Hairston

16 does have a lot going for him, the fact that he does have

17 employment, that he's a smart person, that he obviously is a

18 person who works.  All those are laudable.  The problem is that

19 he also continues to break the law and relatively consistently.

20 　　　　　Not only are we talking about the positive drug tests

21 and the resisting incidents, along with the possession as to

22 the March incident, but also this very serious drug activity

23 from September 2 related to methamphetamine in that

24 circumstance.

25 　　　　　And the unfortunate part is that these contacts that

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1 he's had with law enforcement where he's fleeing or resisting,

2 those are, as the Court points out, simply related to his

3 culpable intent, the fact that he knew that he shouldn't have

4 the drugs, and yet he still did and tried to basically get out

5 of it during the course of it and even today.

6       I think that's really the biggest concern about the

7 breach of trust with the Court is that he's not being honest

8 with himself nor is he being honest with the Court, and so he

9 can't change. And that's a real concern going forward for

10 the -- you know, from the Government's perspective of a person

11 who continues to not do things that his probation officer is

12 asking him to do, but, more importantly, that in the context of

13 this hearing, testifies -- and I would argue that he testifies

14 inconsistent with the truth.

15       Based on that, Your Honor, I would ask that you

16 sentence him to the high end.

17       Thank you.

18     **THE COURT:** Let me say I think I misspoke when I

19 calculated the guidelines because the maximum term of

20 imprisonment on Count One is 24 months, Count Two is 60, but

21 the supervised release terms for both, I think, is 60.

22       Am I right about that?

23     **THE PROBATION OFFICER:** Yes, Your Honor. For Count

24 One, the supervised release term would actually be up to life.

25     **THE COURT:** Count One is life.

1          **THE PROBATION OFFICER:**  For Count Two would be --

2          **THE COURT:**  60 months.

3          **THE PROBATION OFFICER:**  However, Your Honor, we're

4  not recommending reimposed supervised release on Count One due

5  to the fact that the maximum he can serve is 24 months, and,

6  thereafter, there would be no sentence available.

7          **THE COURT:**  Now that I've clarified that, do you

8  agree with that?

9          **MR. CRUMP:**  Your Honor, we agree.

10          **MR. GALYON:**  Yes, Your Honor.

11          **THE COURT:**  Everybody readily agreed with what I said

12  before, which I think might not have been correct.

13          All right.  So, Mr. Hairston, is there anything you

14  would like to say on your own behalf before I make a decision?

15  Let me remind you that you have no obligation to speak.  You

16  can remain silent.  That's your right.  And if you wish to

17  remain silent, I'm not going to hold your silence against you;

18  but if want to be heard, I would be happy to hear from you.

19          I would caution you that I've obviously found the

20  facts to be different from what you testified to on the stand,

21  and the Government put it charitably that your testimony was

22  inconsistent with the truth as to what I found.  But I would be

23  happy to hear from you if you want to say anything before I

24  make a decision in your case.  And if you would like speak to,

25  I'd ask you simply to stand.

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1        **THE DEFENDANT:**  Yeah, so basically I got out in

2   September of last year.  I've been working hard taking care of

3   my kids and my baby momma.  She can vouch for that.  I got a

4   10-year-old and my son just turned 12.  I'm active in both

5   their lives.  My boss, he couldn't make it today.  I work.  I

6   go to work anywhere from 8:00 to 6:00, Monday through Friday.

7   Unfortunately, you guys are siding with the officers, but their

8   testimonies have also been very inconsistent.

9        **THE COURT:**  You can say whatever you want.  I would

10  caution you not to --

11       **THE DEFENDANT:**  Okay.  Well, I'm going to stop at

12  that.  I'm going to leave it at that.

13       I do apologize for coming before you guys again.  I

14  am not an animal like this guy portrays me.  If you ask

15  anybody -- you can even ask Mr. Mauney.  He can vouch as to the

16  relationship that me and him has.  I've always treated him with

17  respect.  I treat everyone with respect.  I love everyone.  I

18  am saved by God.

19       With that being said, I apologize for coming before

20  you, and I hope you have some kind of leniency, because

21  obviously there's nothing I can do here.

22       **THE COURT:**  All right, sir.  Well, I'm going to order

23  that the supervised release term be revoked.  I've considered

24  all the 3553(a) factors that apply under 3583(e).

25       One of them is the nature and circumstances of the

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

offenses.  That's really the biggest problem here is that there
are two instances of drug -- involving drugs, one of at least
smoking marijuana and having possession of some amount of
heroin, whether it's a user amount.  The other is the
methamphetamine, which is more than just a user amount.

And looking at back at our presentence report, you
have several prior convictions involving illegal drugs, cocaine
and marijuana, including the underlying conviction in this case
that you were on supervision for.  So it's disappointing that
you're back.  The preponderance of the evidence indicates you
were back in use of drugs and possession of amounts that were
more than just user amounts as to the methamphetamine.

I would add as an aside -- I mean, I sit here and I
hear cases like this now for 13 years, and the additional money
somebody can make from drugs or the benefit they get from drugs
compared to the downside that's involved -- and you're seeing
it right here -- seems hardly worth it, most of it.  So going
forward, I do encourage you to hold your job, but this isn't
worth it to do this kind of stuff.

You're 33 years old.  You're a high school grad.
You're a smart person obviously, but you need to take
responsibility.  Under these facts, frankly, if you had come in
here and said, Judge, look, I messed up, I'm really sorry, I
messed up, I'm trying to do better, that might have been
different than to come in here and then -- the story I heard is

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1   so inconsistent with the facts.  It is very difficult to take.

2          I want you to deter you from criminal conduct because

3   you're apparently still involved in it, and I am concerned

4   about protecting the public, because drug use and drug

5   purchasing and drug selling, of course, is a danger to the

6   public.

7          So I am going to stay within the guideline range.  I

8   am going to order you be committed to the custody of the United

9   States Bureau of Prisons for 37 months.  That's the higher end

10  of the guideline range.  Frankly, I probably would have gone

11  higher, and I could have gone higher, given the evidence and

12  then my believe that you have come in here and testified on the

13  stand totally inconsistent with that.  But that's going to be

14  24 months on Count One and 37 months on Count Two to run

15  concurrently with each other.

16         That will be followed by a period of supervised

17  release of -- I think what that leaves is 13 months.  Am I

18  doing my math right for Count Two?

19         **THE PROBATION OFFICER:**  Twenty-three months, Your

20  Honor.

21         **THE COURT:**  Twenty-three?

22         **THE PROBATION OFFICER:**  Yes, on Count Two.

23         **THE COURT:**  That's right, 60.  Twenty-three months

24  then left on Count Two.

25         No supervised release anymore on Count One since --

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1 even though it was lifetime supervised release, we've exhausted

2 all of the imprisonment time that can be imposed.

3          And reimpose all conditions of supervision as to the

4 supervised release with the version that was modified as of

5 November 2016, if that's not already in place.  Those are the

6 mandatory and standard conditions that were -- as to those

7 mandatory and standard conditions, those were adjusted or

8 modified in 2016.

9          Any objection to that part?

10          **MR. CRUMP:**  No, Your Honor.

11          **THE COURT:**  Anything else I need to address?

12          **THE PROBATION OFFICER:**  No.

13          **THE COURT:**  If you have a question, you might want to

14 talk to your lawyer first, and then I would be happy to answer

15 any question that you have.

16      (Mr. Crump conferred with the Defendant.)

17          **MR. CRUMP:**  No questions.

18          **THE COURT:**  All right.  For the record, at the

19 outset, the Government had indicated new conduct.  That's not

20 come up in any of the arguments here, so I have not considered

21 that.  I don't think you've had full notice about that, and so

22 for that reason, I did not consider it in my decision-making

23 here.

24          Have you had an opportunity to speak with your client

25 about any rights of appeal that he may have?

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

1          MR. CRUMP:  I have, Your Honor.

2          THE COURT:  Please make sure he is aware if he

3  chooses to file notice of appeal that he must do so in writing

4  within 14 days of the entry of the Court's judgment.  If he

5  cannot afford the cost of his appeal, he can ask the Circuit

6  Court to waive the cost of his appeal.

7          I take it he's prepared to go into custody then at

8  this time?

9          Mr. Marshal, he is in your custody.

10          Good luck to you, sir.

11          Anything further from the Government?

12          MR. GALYON:  No, Your Honor.

13      (END OF PROCEEDINGS.)

14

15                        * * * * * *

16

17

18

19

20

21

22

23

24

25

US v. Jody Hairston  -- SRV hearing  -- 11/18/20

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER




          I,  Briana L. Bell, Official United States Court

Reporter, certify that the foregoing transcript is a true and

correct transcript of the proceedings in the above-entitled

matter.


          Dated this 19th day of January 2021.




                    _____
                    Briana L. Bell, RPR
                    Official Court Reporter

US v. Jody Hairston  -- SRV hearing  -- 11/18/20